2009 UT App 390

**STATE of Utah, Plaintiff and Appellee,**

v.

**Travis James PERKINS, Defendant and Appellant.**

**No. 20080961–CA.**

Court of Appeals of Utah.

Dec. 24, 2009.

---

Blake A. Nakamura, Salt Lake City, and Sara Pfrommer, Park City, for Appellant.

Mark L. Shurtleff, atty. gen., and Kenneth A. Bronston, asst. atty. gen., Salt Lake City, for Appellee.

Before GREENWOOD, P.J., BENCH and McHUGH, JJ.

## OPINION

McHUGH, Judge:

¶ 1 Travis James Perkins appeals his conviction for driving under the influence (DUI), claiming that the trial court erred in denying his motion to suppress the evidence that ultimately led to his conviction. We affirm.

## BACKGROUND [1]

¶ 2 At approximately 3:50 a.m. on December 12, 2007, a Deer Valley security guard (Security Guard) saw Perkins attempting to dislodge his vehicle from a snow bank. After maneuvering so that his car window was parallel to Perkins's window, Security Guard waved and yelled until he finally had Perkins's attention. Security Guard was reluctant to tow Perkins out of the snow because Security Guard believed Perkins to be under the influence of drugs or alcohol. Security Guard's belief was based on his observations that Perkins had red eyes, slurred speech, and a slow response time. Security Guard offered to contact the police for assistance, but Perkins declined. Security Guard called the police anyway, both because he thought Perkins was intoxicated and because the vehicle was approximately two feet from a six-foot drop.

¶ 3 Security Guard reported to the 911 dispatch operator that a vehicle was stuck in the snow but that he was uncomfortable with pulling it out because he did not believe the driver—Perkins—was "in any condition to be driving." In support of that conclusion, Security Guard reported that Perkins had slurred speech. Security Guard also provided the 911 operator with the make and model of the vehicle. While Security Guard was making the police report, Perkins left his car on foot. Security Guard observed Perkins "wobbling a lot, and ... fall[ing] once." [2] He then followed Perkins and watched him walk into a parking garage of a nearby condominium complex.

¶ 4 Officer Vaifoa Lealaitafea received the dispatched report at 3:51 a.m. that "a Deer Valley security officer was trying to assist an intoxicated male that was stuck in the snow." Officer Lealaitafea arrived at Security Guard's location near the parking garage at 3:59 a.m., only moments after Security Guard had lost sight of Perkins in the garage.[3] Security Guard provided Officer Lealaitafea with a summary of what he observed during his encounter with Perkins, a description of Perkins, and Perkins's direction of travel. Officer Lealaitafea passed through the garage, went up the only stairwell, and then followed the single set of fresh footprints in the snow, which led to Perkins's condominium.

¶ 5 The footprints led to the back of the condominium unit up to a concrete patio. Because the ground was covered in snow, Officer Lealaitafea was unsure if he had left

---

1. "The legal analysis of search and seizure cases is highly fact dependent. We therefore begin with a full narration of the facts." *State v. Brake,* 2004 UT 95, ¶ 2, 103 P.3d 699 (citation omitted).

2. The record is unclear as to whether Security Guard reported Perkins's balance problems to the dispatch operator.

3. On his way to Security Guard's location, Officer Lealaitafea noticed a white station wagon with temporary registration tags "off the road in the snow."

the common walkway. The patio was not enclosed by a fence, shrubbery, or other type of divider, and the record suggests it was clear of any furniture or other objects. The patio was connected to Perkins's unit by a sliding glass door. Although Officer Lealaitafea could see into a bedroom through the sliding door because the curtains were not drawn, he could not determine whether anyone was inside from his location in the snow. It was only after he stepped onto the patio that he could see a man, who matched the description given by Security Guard, attempting to hide behind the bed. Officer Lealaitafea then knocked on the glass door and "instructed, 'Hey let me talk to you.'" Perkins, who was wearing boxer shorts and a shirt, opened the door, but he remained inside while Officer Lealaitafea stood on the patio.

¶ 6 Officer Lealaitafea asked Perkins what type of vehicle he drove and where it was located. Perkins responded that he drove a white Subaru, which matched the vehicle description reported by Security Guard and the car Officer Lealaitafea had observed on the side of the road as he was responding to Security Guard's call. Perkins also said that the car was "stuck in the snow ... 'because I drove it.'" Officer Lealaitafea noted Perkins's slurred speech, red eyes, and a strong odor of alcohol, as indicators of intoxication. Perkins consented to Officer Lealaitafea's entrance into his home while Perkins dressed. The pants and shoes that Perkins put on had snow on them. After Perkins was dressed, Officer Lealaitafea asked him to step outside, where the Security Guard identified Perkins as the driver of the snowbound vehicle. Perkins was arrested after failing field sobriety tests.

¶ 7 On December 13, 2007, Perkins was charged by information with DUI. Perkins moved to suppress the evidence, arguing that Officer Lealaitafea did not have reasonable suspicion to detain Perkins and that Officer Lealaitafea entered the protected curtilage of Perkins's home without a warrant. Following an evidentiary hearing, the trial court

concluded that Officer Lealaitafea did not acquire reasonable suspicion based on the information provided by Security Guard. However, the trial court also determined that Officer Lealaitafea's encounter with Perkins was initially consensual, that Officer Lealaitafea acquired reasonable suspicion to detain Perkins during their voluntary encounter, and that Officer Lealaitafea developed probable cause to arrest when Perkins failed the field sobriety tests. Accordingly, the trial court denied the motion. The jury convicted Perkins, and this appeal followed.

## ISSUE AND STANDARDS OF REVIEW

¶ 8 "In an appeal from a trial court's denial of a motion to suppress evidence, 'we review the trial court's factual findings for clear error[,] and we review its conclusions of law for correctness.'" *Salt Lake City v. Bench*, 2008 UT App 30, ¶ 5, 177 P.3d 655 (alteration in original) (quoting *State v. Tiedemann*, 2007 UT 49, ¶ 11, 162 P.3d 1106), *cert. denied*, 199 P.3d 367 (Utah 2008). "In search and seizure cases, no deference is granted to ... the [trial] court regarding the application of law to underlying factual findings." *State v. Alverez*, 2006 UT 61, ¶ 8, 147 P.3d 425.

## ANALYSIS

■ ¶ 9 The Fourth Amendment to the United States Constitution protects "[t]he rights of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV.[4] The Fourth Amendment does not protect a citizen from all forms of search or seizure, only unreasonable ones. *See Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

I. Officer Lealaitafea Had Reasonable Suspicion to Seize Perkins Based upon the Information Conveyed by Security Guard.

■ ¶ 10 "Under the Fourth Amendment, [the United States Supreme Court has] held, a policeman who lacks probable cause but whose 'observations lead him reasonably to

4. The Fourth Amendment is applicable to the states pursuant to the Fourteenth Amendment. *See C.R. v. State (In re A.R.)*, 937 P.2d 1037, 1040 (Utah Ct.App.1997), *aff'd*, 1999 UT 43, 982 P.2d 73.

suspect' that a particular person has committed ... a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (footnote omitted) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)); *accord State v. Worwood,* 2007 UT 47, ¶ 23, 164 P.3d 397 (noting that the Fourth Amendment permits investigatory detentions with less than probable cause so long as the officer has a suspicion that is "particularized and objective" and is "supported by specific and articulable facts"). Such a detention is a level two encounter. *See Salt Lake City v. Ray,* 2000 UT App 55, ¶¶ 10–11, 998 P.2d 274.

¶ 11 Perkins argues that we are bound by the trial court's conclusion that the information provided to Officer Lealaitafea by Security Guard was insufficient to provide the reasonable suspicion necessary to allow Officer Lealaitafea to detain Perkins in order to investigate further. We do not agree. Although we defer to the trial court with respect to factual findings, we review de novo the trial court's legal conclusions based upon those facts. *See Bench,* 2008 UT App 30, ¶ 5, 177 P.3d 655. Applying that standard to the facts of this case, we conclude that Officer Lealaitafea had reasonable suspicion to detain Perkins based upon the information provided by Security Guard.

■■■ ¶ 12 We examine whether an officer had reasonable, articulable suspicion under the totality of the circumstances. *See State v. Kohl,* 2000 UT 35, ¶ 11, 999 P.2d 7. Reasonable, articulable suspicion may arise from an officer's own observations or from external information relayed by an informant. *See id.* ¶ 13. When reasonable suspicion is based on information offered by an informant, we consider three factors in evaluating whether an informant's tip is sufficient to create such suspicion. *See Kaysville v. Mulcahy,* 943 P.2d 231, 235–36 (Utah Ct.App. 1997).

¶ 13 First, we examine the type of tip or informant involved to determine if the tip is reliable. *See id.* at 235. We then evaluate the amount of detail the informant provided about the criminal conduct he observed. *See id.* at 236. Finally, we consider whether the officer was able to corroborate independently the informant's tip. *See id.* Here, Perkins does not contend either that Security Guard was unreliable or that the information was not corroborated. Instead, Perkins contends that the trial court was correct in determining that there was not enough to create reasonable, articulable suspicion that Perkins had committed a crime. We disagree.

■■■ ¶ 14 In his initial report to the dispatch operator, Security Guard expressed reservations about towing Perkins out of the snow because he was concerned that Perkins may be intoxicated. The police can rely on an individual's belief of intoxication because "members of the general public have a common knowledge about whether a person is under the influence of alcohol." *Salt Lake City v. Bench,* 2008 UT App 30, ¶ 20, 177 P.3d 655 (internal quotation marks omitted), *cert. denied,* 199 P.3d 367 (Utah 2008). And, Security Guard agreed to wait for an officer to respond. Officer Lealaitafea received dispatch's report and arrived at Security Guard's location eight minutes after Security Guard's call. Security Guard informed Officer Lealaitafea that Perkins had red eyes and slurred speech, was slow to respond, fled on foot when Security Guard called the police, and stumbled upon leaving the vehicle. Based on these observations, Security Guard indicated that he believed Perkins was intoxicated. Security Guard also gave Officer Lealaitafea a description of Perkins and told Officer Lealaitafea where he had seen Perkins go. We hold that the totality of this information created a reasonable, articulable suspicion that Perkins had been involved in criminal activity—driving while intoxicated.

¶ 15 Based on that reasonable, articulable suspicion, had Officer Lealaitafea encountered Perkins prior to Perkins's entry into his home, Officer Lealaitafea could have detained Perkins to investigate further. *See Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (permitting a peace officer to detain a citizen briefly to investigate the officer's reasonable suspicion that the citizen is or has been involved in criminal activity); *see also State v. Bean,* 869 P.2d

984, 988 n. 3 (Utah Ct.App.1994) (noting that even if the defendant had been seized in a mall parking lot, the defendant's Fourth Amendment rights were not violated because the officer had reasonable suspicion to detain the defendant).[5] Our case is complicated, however, by Perkins's retreat into his home. Contrary to the State's argument, Officer Lealaitafea could not lawfully seize Perkins from within his home on the basis of reasonable suspicion alone. *See State v. Beavers,* 859 P.2d 9, 17 (Utah Ct.App.1993) ("[W]e reject the State's argument that police can enter a dwelling without a warrant on the basis of reasonable suspicion. An extension of the *Terry[ v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] doctrine to warrantless entries of private premises is contrary to Fourth Amendment principles." (footnote omitted)). Thus, although Officer Lealaitafea had reasonable suspicion that Perkins had been driving while intoxicated, he could not seize Perkins within his home without a warrant or circumstances that created an exception to the warrant requirement.[6]

## II. Officer Lealaitafea Did Not Need a Warrant to Enter the Patio.

¶ 16 Perkins contends that Officer Lealaitafea entered Perkins's home without a warrant when he first stepped onto the concrete patio adjacent to the bedroom. *See generally Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ("[S]earches and seizures inside a home without a warrant are presumptively unreasonable[,] ... subject to certain [limited] exceptions." (citations and internal quotation marks omitted)); *Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) ("[T]he home is accorded the full range of Fourth Amendment protections."). According to Perkins, his constitutional right to privacy in his home extended to the patio, as protected curtilage of the home. *See generally United States v. Dunn,*

480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (reaffirming that "the Fourth Amendment protects the curtilage of a house"). "[C]urtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of his life.'" *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (citation omitted). The State contends that Perkins "had no legitimate expectation of privacy in [the] patio." "[T]he burden of establishing a legitimate expectation of privacy is on the party claiming a Fourth Amendment violation." *United States v. Cavely,* 318 F.3d 987, 994 (10th Cir.2003).

¶ 17 The determination of whether an area is protected curtilage is a question of law, which we review de novo, but such a determination depends upon factual findings, which we examine for clear error. *See United States v. Cousins,* 455 F.3d 1116, 1121 (10th Cir.2006). The United States Supreme Court has identified four factors (the *Dunn* factors) for determining whether an area is properly designated as curtilage: (1) the proximity of the area to the house; (2) the inclusion of the area "within an enclosure surrounding the home"; (3) the uses of the area; and (4) the efforts made to protect the area from observation. *See Dunn,* 480 U.S. at 301, 107 S.Ct. 1134.

## A. Proximity of the Area to the House

¶ 18 The patio was attached to the condominium unit, and the two were separated only by a sliding glass door. Thus, the first factor weighs in favor of a determination that the patio was part of the curtilage.

## B. Enclosure of the Area

¶ 19 The second factor examines whether the area was enclosed. *See id.* The trial court found that public access to the patio was neither barred by physical structures, such as a fence or a railing, or by signs denying access. *See generally United States*

---

5. "A peace officer may stop any person *in a public place* when he has a reasonable suspicion to believe he has committed ... a public offense, and may demand his name, address, and an explanation of his actions." Utah Code Ann. § 77–7–15 (2005) (emphasis added).

6. We address the relevant exception to the warrant requirement in part III, *see infra* ¶ 25.

*v. French,* 291 F.3d 945, 953 (7th Cir.2002) (identifying "gates, barriers, or 'no trespassing' signs" as evidence that an area is enclosed and not open for public access). Further, we reject Perkins's claim that the bluff upon which his patio sat provided a natural enclosure. Although Officer Lealaitafea testified that he had to climb up a hill while following Perkins's footprints to the back patio, he was unsure whether he had left a common walkway due to the snow covering the area. Moreover, Perkins admits that the entire complex sits upon the bluff. Thus, the second factor supports the conclusion that the patio was not protected curtilage of the home.

### C. Uses of the Patio

¶ 20 The third factor requires us to consider whether Perkins was using the patio as an extension of his home. *See Dunn,* 480 U.S. at 302, 107 S.Ct. 1134. Officer Lealaitafea testified that the patio was just a "concrete slab." The trial court found, "It was snow covered ground in December, alleged to be a patio...." Thus, this factor also weighs against a determination that the patio was curtilage.

### D. Efforts Made to Protect the Patio from Observation

¶ 21 Perkins also failed to demonstrate that he had taken action to prevent other persons from observing any activities occurring on his patio. Instead, he relies exclusively on his contention that his patio is situated upon a bluff on the back side of his condominium unit, outside the view of any person upon the walkway Perkins admits was public. This position, however, does not support an inference that Perkins had a subjective expectation of privacy in his patio. Perkins may expect that people on the main walkway could not see activity on his patio, but that expectation does not necessarily extend to the neighbors who have adjacent patios or access to the areas beyond the patios.[7] Although Perkins may be correct that a person is not required to block a view

or incur an additional expense where the natural geography creates a privacy barrier, we cannot determine, on this record, that any such barrier was present here.

¶ 22 Perkins further argues that he had an expectation that people would not enter his patio and peer through his sliding glass door. That argument is unavailing to his claim that the patio was curtilage of the home. The expectation of privacy within his unit could be maintained simply by closing the curtains. Indeed, if Officer Lealaitafea were in a lawful position while on the patio, he could look through an uncovered window without violating the Fourth Amendment. *See United States v. Hersh,* 464 F.2d 228, 229–30 (9th Cir.1972) (holding that there was no Fourth Amendment violation where officers discovered a drug laboratory after looking through a window partially covered with a drape while waiting for someone to answer their knock on the defendant's front door). The final factor, therefore, also favors a conclusion that the patio was not curtilage.

¶ 23 The *Dunn* factors weigh against a determination that "the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). Furthermore, Perkins had the burden of demonstrating that he had an expectation of privacy in the patio itself. *See United States v. Cavely,* 318 F.3d 987, 994 (10th Cir.2003). He has not carried that burden. Consequently, we hold that, under the facts of this case, Perkins's back patio is not part of the curtilage of the home, which would require a warrant for entry. As a result, Officer Lealaitafea's entrance onto the patio, after following Perkins's own path to the home, for the purposes of detaining Perkins to investigate a reliable tip that Perkins had been driving under the influence of alcohol, did not constitute a warrantless entry into Perkins's home.

---

7. Perkins offered very little evidence on the geographical layout of his unit relative to the other units. Although Perkins's questions on cross-examination elicited testimony that suggests that

a common walkway does not lead directly to Perkins's back patio, he presented no evidence that his neighbors did not have access to the area around his patio.

### III. Perkins Voluntarily Opened the Glass Door to Speak with Officer Lealaitafea.

¶ 24 Even if the patio was not curtilage of the home, Perkins argues that Officer Lealaitafea violated Perkins's Fourth Amendment rights by compelling him to open the glass door and answer questions, thereby engaging in an unauthorized seizure of Perkins from within his home without a warrant. In contrast, the State contends that the encounter was voluntary and, thus, did not raise any Fourth Amendment concerns. Perkins argues that it was a level two investigatory seizure unsupported by a warrant. The State contends that the encounter between Perkins and Officer Lealaitafea at the glass door was consensual.

¶ 25 "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Consequently, searches or seizures inside a home without a warrant are presumptively unreasonable. *See Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). Thus, in the absence of circumstances that create an exception to the warrant requirement, Officer Lealaitafea could not forcibly enter the home or seize Perkins without violating the Fourth Amendment. *See id.* One of the recognized exceptions to the warrant requirement is that the officer may engage in encounters to which a person consents. *See State v. Bisner,* 2001 UT 99, ¶ 43, 37 P.3d 1073. A consensual encounter constitutes a level one stop. *See Salt Lake City v. Ray,* 2000 UT App 55, ¶ 11, 998 P.2d 274.

¶ 26 Consequently, we now determine whether the encounter between Perkins and Officer Lealaitafea was voluntary or compelled. Whether a person gave consent is a question of law, which we review for correctness. *See United States v. Spence,* 397 F.3d 1280, 1282 (10th Cir.2005) (An appellate court "conducts a de novo review of all the relevant circumstances to determine whether an interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment." (internal quotation marks omitted)). "An officer may approach a citizen at any time and pose questions so long as the citizen is not detained against his will." *State v. Markland,* 2005 UT 26, ¶ 10 n. 1, 112 P.3d 507. If the person "remains free to disregard the questions and walk away," there has been no seizure for Fourth Amendment purposes and the officer may engage in the encounter without intruding upon the "person's liberty or privacy." *State v. Adams,* 2007 UT App 117, ¶ 10, 158 P.3d 1134, *cert. denied,* 168 P.3d 1264 (Utah 2007). A level one stop becomes a level two seizure "when a reasonable person, in view of all the circumstances, would believe he or she is not free to leave." *Ray,* 2000 UT App 55, ¶ 11, 998 P.2d 274 (quoting *State v. Jackson,* 805 P.2d 765, 767 (Utah Ct.App.1990)). Perkins contends that a reasonable person, under the circumstances present here, would have believed that compliance with Officer Lealaitafea's instruction, "Hey let me talk to you," was mandatory. In support of that position, Perkins relies on the fact that Officer Lealaitafea, in full uniform, left the common walkway, climbed up a hill, entered the patio at 4 a.m., and after observing Perkins's attempt to hide, used what Perkins characterizes as authoritative language to order Perkins to come to the glass door and talk.

¶ 27 The United States Supreme Court has identified several factors that might indicate a level two seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *accord State v. Patefield,* 927 P.2d 655, 659–60 (Utah Ct.App.1996) (applying the factors articulated in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). We agree with the State that these factors support the conclusion that the encounter between Officer Lealaitafea and Perkins at the glass door did not constitute a level two seizure.

¶ 28 First, Officer Lealaitafea was alone when he knocked at the door and, because

the door was transparent, Perkins could see that. Second, nothing in the record indicates that Officer Lealaitafea brandished his gun or made any other show of force. Third, the officer and Perkins were separated by a locked door thereby making it impossible for Officer Lealaitafea to touch Perkins. Each of these factors is consistent with a voluntary encounter. With respect to the final factor—the tone of voice used—Perkins contends that it was a command, while the State argues it was merely a request. The evidence presented to the trial court on this issue is more supportive of the State's characterization. Although Officer Lealaitafea initially testified that "I just knocked on the door. He came to the door. Like, I instructed, 'Hey let me talk to you,'" he immediately clarified that "I didn't yell, I just said, 'Hey, let me-come and talk to me.'" Perkins offered no evidence which contradicted that testimony. In the absence of a command, Perkins was free to ignore Officer Lealaitafea's knock and walk away from the encounter. *See generally United States v. Cruz–Mendez*, 467 F.3d 1260, 1264 (10th Cir.2006) (recognizing a "knock and talk" as a permissible consensual encounter, even in the absence of reasonable suspicion), *cert. denied*, 549 U.S. 1151, 127 S.Ct. 1027, 166 L.Ed.2d 773 (2007).

¶ 29 Nor are we convinced that the other facts noted by Perkins resulted in a seizure. As we have previously discussed, Officer Lealaitafea had reasonable suspicion to detain Perkins. Thus, there is nothing improper about the fact that he followed the footprints along the route established by Perkins to the condominium. Likewise, because the patio was not curtilage of the home, Officer Lealaitafea's entry onto the patio does not implicate Perkins's Fourth Amendment rights. And although it was 4 a.m., the short time between Security Guard's report and the officer's arrival at Perkins's condominium,[8] combined with Officer Lealaitafea's visual confirmation that Perkins was awake, make the knock on the door and request to

communicate reasonable. *See State v. Humphrey*, 2006 UT App 221, ¶ 25, 138 P.3d 590 (rejecting the defendant's claim that the police's entry into his home at midnight without a warrant violated the Fourth Amendment where the defendant invited the officers inside and the totality of the circumstances supported the conclusion that the consent to entry was voluntary). Finally, although Officer Lealaitafea observed Perkins trying to conceal himself behind the bed while wearing only his boxer shorts and shirt, Officer Lealaitafea could still request that Perkins talk to him without turning the encounter into a seizure. *See Cruz–Mendez*, 467 F.3d at 1261–62 (concluding that the occupant's consent to talk and to allow the officer to enter her home was consensual despite the fact that the occupant was in her pajamas). According to Officer Lealaitafea, he knocked and stated, "Come and talk to me." In response, Perkins opened the sliding door and had a conversation with Officer Lealaitafea. *See generally State v. Beavers*, 859 P.2d 9, 17 (Utah Ct.App.1993) (acknowledging that a "polite knock at the door" would have been permissible). Based on the totality of the circumstances, we agree with the trial court that Perkins consented to the conversation with Officer Lealaitafea.[9]

## CONCLUSION

¶ 30 Officer Lealaitafea had reasonable, articulable suspicion to detain Perkins and did not need a warrant to enter the patio because it was not protected curtilage of the home. Although Officer Lealaitafea could not seize Perkins against his will from within his home without a warrant, Perkins voluntarily consented to Officer Lealaitafea's request to talk and to Officer Lealaitafea's subsequent request to enter the condominium. Accordingly, we affirm the trial court's denial of the motion to suppress and affirm Perkins's conviction.

---

8. Security Guard called 911 at 3:51 a.m., and Officer Lealaitafea arrived at Security Guard's location at 3:59 a.m. Fourteen minutes later, at 4:13 a.m., Officer Lealaitafea initiated the field sobriety testing.

9. Perkins does not argue on appeal that Officer Lealaitafea acted inappropriately in response to the information he obtained after the encounter at the sliding door.

¶ 31 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and RUSSELL W. BENCH, Judge.